CURTAIN SUPPLY CO. v. NATIONAL LOCK WASHER CO.

(Circuit Court of Appeals, Seventh Circuit.    January 5, 1910.)

No. 1,608.

PATENTS (§ 328*)—INFRINGEMENT—CURTAIN FIXTURE.

　　The Paterson patent. No. 754,404, for a curtain fixture, is not infringed by the device of the Hoyt patent, No. 676,557, conceding priority of invention to Paterson; the two devices as shown in the specifications and drawings of each operating on wholly different principles.

Appeal from the Circuit Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit in equity by the Curtain Supply Company against the National Lock Washer Company. Decree for defendant (174 Fed. 45), and complainant appeals. Affirmed.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The appeal is from a decree dismissing complainant's bill to restrain infringement of letters patent No. 754,404, issued March 8, 1904 (application filed August 1, 1901), to James W. Paterson, for a curtain fixture.

The alleged infringing device is made under patent No. 676,557, issued June 18, 1901 (application filed December 8, 1900), to Daniel Hoyt.

Evidence was introduced on the hearing, intended to prove that although the Paterson patent was later than the Hoyt patent, both in date of application and date of issue, the Paterson invention antedated the Hoyt invention.

Following are the Paterson drawings and the descriptive portion of the patent:

"In the drawings let 5 represent a flexible curtain or shade, which, it is to be understood, will be mounted upon a spring-actuated shade-roller (not shown.) In the lower margin of the shade is mounted a suitable tube or hollow curtain-stick, which in the present illustration is shown as a flat tube (marked 6). Within the hollow of this curtain-stick and near its outer ends are slidably and pivotally mounted the shoes 7, having friction-surfaces 8. The shoes 7 are shown as in the form of cams and as provided in the shank or body portion with a slot 9, through which a pin 10 passes, said pin being fixedly secured in the shade-stick. This slot-and-pin connection renders the shoes capable of slight endwise as well as a rocking motion, which gives them a cam action and affords the necessary adjustability to variations in the window-frames. Rods 11 are loosely connected to the shoes 7 by the pivots (marked 12), and these rods are surrounded by the springs 13.

"The mechanism described is preferably duplicated in each end of the shade-stick, and the rods 11 preferably extend inwardly to near the middle of the stick and are provided with actuating devices whereby they may be retracted against the thrust of their controlling-springs. As shown, the rods have a threaded connection with the apertured plates 14, the apertured portions of said plates overlapping each other, and the operating-bolt having cranks 16 lying within said apertures and engaging the walls thereof, the cranks being oppositely disposed, so that by rotation of the bolt in one direction the rods are moved, the apertured plates sliding upon each other, and the friction-surfaces 8 may be positively withdrawn from contact with the bottoms of the grooves in the window-frame or their frictional contact therewith so far reduced as to enable the curtain to be easily lowered. The ends of the tube 6 project into the groove to serve as guides, and it will be observed that the upper wall of the shade-stick is cut away, as shown at 6a, and that the rear portion of the shoe

7 is rounded off. Various obvious changes can be made in connection with this guiding feature without departing from the invention."

Following are the Hoyt drawings and the descriptive portion of the patent:

"Figure 1 is a front elevation of a window, the casing being partly broken away to illustrate the application and use of my novel shade-holder; Fig. 2, an enlarged detail sectional view, and Fig. 3 is an edge view of one of the guides or travelers.

"A denotes a window, and B a window-casing, which is shown as provided in front of the window-sash with a groove 10. It should be understood, however, that this groove may be deep or shallow, as preferred, it being simply

178 F.—7

necessary that enough of a groove be provided on each side to retain the guide in place.

"C denotes a shade or curtain, preferably a spring or self-acting shade.

"My novel shade-holder comprises the following elements, to wit: A tube 11, fixed at the lower edge of the curtain, guides or travelers 12, rigidly secured to the ends of the tube, locking-cams 13, lying within the guides and bearing upon the casing, rods 14, finger-pieces 15 for retracting the locking-cams, and springs 16 for returning the locking-cams to the locking position after they have been retracted. The guides are rigidly secured to the ends of the tube in any suitable manner. In the present instance I have shown the ends of the tube as threaded externally to engage corresponding threads in hubs 17 on the guides. The guides may be formed in any suitable manner—that is to say,. they may be cast or may be struck up and formed from sheet metal, the only requirement being that each guide be provided with a groove 18, at the ends of which rollers 19 are pivoted and in which also the locking-cams are pivoted, as at 20. The rollers bear lightly upon the casing, so as to prevent the possibility of jaming or wedging, the guides, with their rollers, insuring that no matter whether the power applied to move the shade be applied in a direct line or not, the shade, if it moves at all, must move evenly, the only effect of sidewise pressure being to make one or the other of the rollers in the guides bear more heavily upon the casing than the others do. The locking-cams are pivoted within the guides below the tube and are so shaped and so pivoted that they normally bear obliquely upon the casing above the pivotal point, the edges of the locking-cam being serrated, roughened, or provided with holding-pads to cause them to engage the casing. It will be seen that the action of each locking-cam when power is applied to raise the shade is to move the tube and the shade in the opposite direction—that is, against the opposite side of the casing—and as there is a similar locking-cam acting in precisely the same manner on the other side of the shade it follows that both sides of the shade will be rigidly locked against upward movement through the engagement of the cams with the casing and that the degree of pressure of the cams against the opposite sides of the casing will be wholly dependent upon the amount of power applied to raise the shade, so that it is practically impossible to raise the shade without manipulating the locking-cams, as will presently be explained. In practice I make springs 16 light, as I do not depend upon the power of the springs to hold the cams in operative position, the springs merely returning the locking-cams to their locking position the minute the pressure upon the finger-pieces is relieved after the shade has been raised or lowered. The action of the springs, therefore, is to place the locking-cams in the locking position; but after they are so placed the locking action is effected wholly independently of the springs. Rods 14 are pivoted to the upper ends of the locking-cams and extend through the tube toward the center, the inner end of each rod passing through a collar 21, which is fixed within the tube. At the inner end of each rod is a finger-piece, which extends through a slot 22 in the under side of the tube, the slot of course passing through the shade and being shown as surrounded by a plate 23. The rods and finger-pieces may be made in a single piece, or the finger-pieces may be soldered to the rods, or the inner ends of the rods may be threaded and tapped into the finger-pieces, as shown in the drawings. Each rod has a collar rigidly secured thereto. The springs lie between the collars fixed in the tube through which the rods pass and the collars fixed to the rods, respectively, their action being to move the rods outward and to place the locking-cams in operative position."

Claims 1 and 2 of the Paterson patent (the claims sued upon) are as follows:

"1. In a window-shade holder the combination with a casing and a spring-actuated shade, of a bar carried by the shade, a pivoted locking-cam at the end of the bar adapted to engage the casing above its pivoted point, a rod carried by the bar and pivotally connected to the cam, a spring for normally, forcing the rod outward to set the cam into holding engagement with the casing, and means for retracting the rod.

"2. In a window-shade holder the combination with a casing and a spring-actuated shade, of a bar carried by the shade having ends extended to serve as guides, pivoted locking-cams at the ends of the bar, spring-actuated rods

within the bar pivotally connected to the cams, and means for retracting the rods to release the cams from holding engagement with the casing."

The corresponding claims of the Hoyt patent are as follows:

"1. A window-shade holder comprising a tube, guides rigidly secured to the ends of the tube, rollers at the ends of the guides adapted to bear lightly on the casing, spring-actuated locking-cams pivoted to the guides and adapted to engage the casing above their pivotal points, and means for retracting the locking-cams when it is desired to move the shade upward.

"2. A window-shade holder comprising a tube, guides rigidly secured to the ends of the tube and having rollers adapted to bear lightly upon the casing, locking-cams pivoted in the guides and adapted by engaging the casing to hold the shade against upward movement, means for retracting the locking-cams to release the shade and springs for returning the locking-cams to the locking position after they have been retracted."

The further facts are stated in the opinion.

Charles C. Linthicum, for appellant.

J. Edgar Bull, for appellee.

Before GROSSCUP, BAKER, and SEAMAN, Circuit Judges.

GROSSCUP, Circuit Judge, after stating the facts as above, delivered the opinion.

The contention of fact, put forth by the appellant to carry his patent back of the Hoyt patent, is that Paterson, the purchasing agent of the Adams & Westlake Company, shortly before Thanksgiving 1895, conceived the fixture embodied in his patent, put it into a sample frame and operated it, and, after finding that it worked satisfactorily, dismounted it and took it home; that in March 1901, in pursuance of an agreement to turn over to appellant any inventions which he at that time had or should subsequently make, this original fixture was taken from its retreat and brought to the office of appellant's solicitors, for the purpose of obtaining a patent thereon; that thereupon it was put in the hands of a draughtsman, with instructions to make a drawing exactly like the original; and that five months subsequently, August 1, 1901, an application, embodying such drawings, was lodged in the Patent Office—the delay being due "to the pressure of other matters in the office of complainant's solicitors." Now all this might appear as a mere matter of fact narrative, exciting no inquiry, but for the fact that in June 1901, at a convention of the Master Mechanics and Master Car Builders' Association, at Saratoga, the Hoyt device, subsequently embodied in the Hoyt patent, was exhibited—an exhibit that came immediately to the knowledge of Paterson and his solicitors, bringing forth a completion of the application said to have been begun in the March preceding, with the view, as stated by complainant's solicitors, "of throwing the Hoyt patent into interference, as the date of conception and the making of the model ante-dated the Hoyt patent."

In the light of these events and of this purpose, a comparative examination of the Paterson drawings, descriptions and claims, and the Hoyt drawings, description and claims, is interesting. Hoyt says:

"My invention has for its object to provide a window-shade holder which will permit the shade to be drawn down practically without resistance and without manipulation of any parts whatever and which will automatically lock the shade against upward movement in any position in which it may be placed, it being an important feature of my novel shade-holder that the locking of the

shade is effected by cam action rather than by spring action and that when force is applied to raise the shade that entire force is caused to act on both sides of the casing to resist the upward movement of the shade, thus rendering it practically impossible to raise the shade by a direct upward movement, while, on the other hand, the shade may be instantly and conveniently released by manipulation of the holder, it being understood, of course. that the holder is especially adapted for use upon spring or, as they are commonly called, 'self-acting' shades or curtains."

And to this end, he employs a cam, as shown in the diagram, so pivoted that when any attempt is made to raise the curtain without pressing the finger-pieces, the strain chiefly falls, not upon the spring, but upon a fixed pivot whereby the locking action becomes effectual. Indeed, in this locking action, the spring has little part.

In the Paterson description, the invention is said to relate "to that class of curtain-fixtures wherein the lower margin of the shade is provided with spring-actuated friction-shoes serving to restrain the shade against the tendency of its winding-up spring." And again, "If it be desired to adjust the curtain to a higher position, it can be forced up against the holding action of the shoes; but as such mode of adjustment would have a tendency to throw the shoes out of the groove the proper mode of operation is to retract the shoes by operating the bolt 15, whereupon the curtain may be adjusted up or down, and when the bolt is released the springs will return the friction-shoes into contact with the window-frame and hold the curtain in the adjusted position"; and the drawings show friction shoes as pointed out in the description.

Reading these two descriptions in the light of their respective drawings, the difference in intended operation is manifest. In the Paterson device, the force employed to overcome the rise or fall of the curtain is friction; in the Hoyt device it is true locking action. In the Paterson device the implement used is a friction shoe, with some resemblance to a cam; in the Hoyt device the implement used is a true cam, with very little reference to friction. In the Paterson device, the shoe is pivoted in a slot, whereby the friction is varied according to the pressure of the spring; in the Hoyt device the cam is pivoted on a fixed pivot, the spring having little, or nothing, to do with its locking action. The two devices, on the drawings and descriptions alone, so far as this feature of window shades is concerned, are on entirely distinct lines of thought.

But when we come to the claims of the Paterson patent (drawn after the Hoyt patent was known to Paterson's solicitors, and with a view to interference), the distinction above pointed out is entirely dropped. No longer does Paterson call his shoe "a friction shoe"—it has now become "a pivoted locking-cam." The shoe remains, in the drawing, what it was before; its function remains as set forth in the descriptive portion of the patent; but it has changed its name to make it appear a kinsman of the Hoyt patent. Possibly, grounds for interference were thus raised. But be that as it may, no identity of actual function or operation—no tracing of the two devices to one ancestor—has followed. Strangers to each other at birth, they remained strangers to each other in blood, at least, to the end.

We have put our decision upon this ground, because we think it more likely, in this way, to bring about a permanent adjustment of the par-

ties' respective rights. Did this ground not exist, however, we would be compelled to find, upon the record before us, either that the so-called device put away by Paterson in 1895, upon which his patent is said subsequently to have been drawn, was a mere experiment, inoperative and impracticable; or, being operative and practicable, was abandoned; for, in view of Paterson's relation to the window-shade art, including his own financial means, and his access to those who had financial means, no other explanation of the delay in filing his application for a patent is at all satisfactory. Here again, the Hoyt invention comes into the Paterson narrative as an important figure; for although the Paterson device, as set forth in the patent, is along the old lines of the art, and differs fundamentally from the Hoyt device, the superficial resemblance to the Hoyt device is so much nearer in this device of Paterson than in the others, that it could well have been, for that reason, dug up as the more promising device upon which to make a contest.

The decree of the Circuit Court is affirmed.